**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARLA FREEMAN,
                    *Petitioner-Appellant,*

          v.

ALBERTO R. GONZALES, Attorney
General,
                    *Respondent-Appellee.*

No. 04-35797

D.C. No.
CV-04-00666-PA

OPINION

Appeal from the United States District Court
for the District of Oregon
Owen M. Panner, Senior Judge, Presiding

Argued and Submitted
September 12, 2005—Portland, Oregon

Filed April 21, 2006

Before: Raymond C. Fisher, Ronald M. Gould and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Fisher

## COUNSEL

Brent W. Renison and Michael J. Millender, Tonkon Torp, LLP, Portland, Oregon, for the petitioner-appellant.

Kenneth C. Bauman, Assistant United States Attorney, Portland, Oregon, for the respondent-appellee.

## OPINION

FISHER, Circuit Judge:

This appeal concerns the fate of a young alien widow who seeks to remain in the United States notwithstanding that her citizen husband, to whom she was married for only a short time, tragically died in a car accident and, according to the government, thereby "stripped" her of her status as his "spouse." Complicating the widow's appeal is the fact that although she (along with her citizen spouse) had petitioned to adjust her status to that of lawful permanent resident, she entered the United States under the terms of a special visa waiver program that limited her to a 90-day visitor's stay in this country and required her to waive her rights to contest the government's decision to remove her. She now asks us, not to grant her lawful permanent resident status — something we cannot do — but rather, to determine whether she remains a "spouse" who can qualify for such status.

## I. Background

Carla Freeman (Mrs. Freeman), a dual citizen of South Africa and Italy, met Robert Freeman, a United States citizen,

while she was temporarily working in the United States as an au pair. The Freemans became engaged and thereafter were married near Chicago, Illinois in February 2001. Shortly after the marriage, Mrs. Freeman went back to South Africa. She returned to the United States in June 2001 under the terms of a special visa waiver program (VWP) granting her a 90-day visitor's stay in this country.[1] In September 2001, before Mrs. Freeman's 90-day visa waiver expired, Mr. Freeman filed a Petition for Immediate Relative (Form I-130) attesting to the fact of their marriage and his wife's current status as a VWP entrant. The same day, Mrs. Freeman filed an Application to Register Permanent Resident or Adjust Status (Form I-485).[2] The filing of these forms initiated the formal process for adjusting Mrs. Freeman's status to that of a lawful permanent resident (LPR), a status granted to the non-citizen spouses of U.S. citizens. Concurrently with the filing of the I-130 and I-485 forms, the Immigration and Naturalization Service (INS) granted Mrs. Freeman a work authorization, effectively treating her as no longer simply a visitor subject to the 90-day limitation of the VWP.[3]

While their application was pending, Robert Freeman was tragically killed in a car accident shortly before the Freemans' first wedding anniversary. Subsequently, when the Depart-

---

[1]The Visa Waiver Program authorizes citizens of certain enumerated countries, including Italy, one of Mrs. Freeman's countries of citizenship, to enter the United States without a visa for a term no longer than 90 days. In exchange for this procedural benefit, VWP entrants waive their right to challenge any removal action other than on the basis of asylum (the no-contest clause). They are, however, allowed to seek adjustment of their status by filing an immediate relative petition. *See* 8 U.S.C. §§ 1187, 1255(c)(4). The VWP is discussed more fully in section II. A., *infra*.

[2]Although the Form I-360 is technically a "Petition" and the Form I-485 is technically an "Application," we use those terms interchangeably throughout this opinion.

[3]The INS has since been abolished and its functions transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 at 2142 (2002).

ment of Homeland Security (DHS) finally reviewed her application in May 2004, the district director for the U.S. Citizenship and Immigration Services ruled that Mrs. Freeman, now a widow, no longer qualified for an adjustment of status because she was not a "spouse" for purposes of the Immigration and Nationality Act (INA), her husband's death having occurred before they had been married for two years. Further, the director ruled that Mrs. Freeman, as a VWP entrant subject to the program's no-contest clause (*see* n.1, *supra*), had waived any right to renew her adjustment of status application or obtain review of his decision by an immigration judge. He ordered her to leave the United States because her VWP authorization had expired.

Mrs. Freeman petitioned for a writ of habeas corpus in the federal district court, challenging the district director's determinations that she was no longer a spouse entitled to adjustment of status and that she had waived any review of the director's ruling. The district court denied her habeas petition. Mrs. Freeman timely filed a notice of appeal to this court, but has since returned to South Africa where she remains subject to 8 U.S.C. §§ 1227 and 1182(a)(9), which prohibit her from reentering the United States for 10 years from the date of her departure.[4]

Mrs. Freeman's appeal raises two questions, both requiring us to interpret statutory language to resolve matters of first impression in this circuit. The first concerns the scope and applicability of the Visa Waiver Program's no-contest clause, and the second concerns the proper definition of "spouse" for

---

[4]Because Mrs. Freeman's appeal was pending when the REAL ID Act became effective (May 11, 2005), we treat this appeal as a timely filed petition for review. *See Alvarez-Barajas v. Gonzales*, 418 F.3d 1050, 1052-53 (9th Cir. 2005); § 106(c) of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, 311 (2005). Accordingly, we review not the district court's denial of the habeas petition but rather the agency's determination, which we review de novo as to any purely legal questions. *See Alvarez-Barajas*, 418 F.3d at 1053.

purposes of adjustment of status under the immigration laws. We hold that once a VWP entrant files an adjustment of status application as an immediate relative, as contemplated by 8 U.S.C. § 1255(c)(4), the alien is entitled to the procedural guarantees of the adjustment of status regime, *see* 8 C.F.R. § 245.2, and to that extent is no longer subject to the Visa Waiver Program's no-contest clause. We further hold that an alien widow whose citizen spouse filed the necessary immediate relative petition form but died within two years of the qualifying marriage nonetheless remains a spouse for purposes of 8 U.S.C. § 1151(b)(2)(A)(i), and is entitled to be treated as such when DHS adjudicates her adjustment of status application.[5]

## II.   Visa Waiver Program

### A.   The VWP Regime

[1] The Visa Waiver Program authorizes the government to waive visa requirements for citizens of certain favored countries. *See* 8 U.S.C. § 1187.[6] Under the terms of the VWP, as a condition of entering the United States without a visa, Mrs. Freeman had to leave within 90 days and, under the no-contest clause, agree to waive any right:

> (1) to review or appeal under [the INA] of an immigration officer's determination as to the admissibility of the alien at the port of entry into the United States, or (2) to contest, other than on the basis of an application for asylum, any action for removal of the alien.

---

[5]Throughout this opinion we refer to the citizen spouse as the husband and the alien spouse as the wife/widow. However, neither the immigration laws we review nor our holdings make any distinction between the sexes.

[6]Unless otherwise indicated, all statutory citations herein are to Chapter 8 of the United States Code.

§ 1187(b). We have described the no-contest clause as "the linchpin of the [Visa Waiver] program," which "assures that a person who comes here with a VWP visa will leave on time and will not raise a host of legal and factual claims to impede [her] removal if [s]he overstays." *Handa v. Clark*, 401 F.3d 1129, 1135 (9th Cir. 2005). Notwithstanding that the no-contest clause severely restricts an alien's ability to seek review of a removal decision, the alien may still claim that she is not subject to the VWP procedures at all or that the law requires that she be brought before an immigration judge (IJ) prior to removal. *See id.* at 1133.

**[2]** Although the no-contest clause was designed generally to limit the rights of alien visitors and prevent them from challenging their removal, the INA does not entirely preclude such visitors from seeking to extend their stay. Specifically, § 1255(c)(4) provides that a VWP visitor may seek to adjust her status to that of a permanent resident through an immediate relative petition, the procedure invoked by the Freemans. *See Faruqi v. Dep't of Homeland Security*, 360 F.3d 985, 986-87 (9th Cir. 2004) (noting that VWP visitors are eligible "for adjustment of status . . . on the basis of either (1) an immediate relative petition or (2) an application for asylum."); *see also* 8 C.F.R. § 245.1(b)(8). Once an adjustment of status application is filed, certain procedural safeguards are in place to ensure fair adjudication of the application. *See generally* 8 C.F.R. § 245.

Mrs. Freeman argues that once she (and her husband) initiated the adjustment of status process by filing the necessary forms, her right to remain in the United States and to challenge any adverse decision became subject to the procedural protections governing adjustment of status applications. Accordingly, the district director erred in applying the VWP no-contest proviso to her in denying her adjustment of status application. The government, however, insists that the VWP no-contest proviso remains in force and precludes Mrs. Freeman from challenging her removal order and the district

director's determination that she is no longer a qualifying spouse. It argues that only *asylum seekers* are exempted from the no-contest clause under the express terms of § 1187(b)(2), and Mrs. Freeman is not seeking asylum.[7]

We think the government's position ignores the interplay between the adjustment of status regime and the visa waiver program, which explicitly allows VWP visitors to file an adjustment of status application pursuant to an immediate relative petition. *See* § 1255(c)(4). As we shall explain, the text and purpose of this complex statute, along with DHS's action in Mrs. Freeman's case, persuade us that once a VWP visitor properly files an adjustment of status application, the VWP no-contest clause does not deprive the visitor-applicant of the procedural guarantees afforded any applicant seeking adjustment of status. *See* 8 C.F.R. § 245.2.

B.   The Right to Adjust Status

[3] Section 1255 explains that certain classes of non-immigrants may petition the Attorney General for adjustment of status to that of a lawful permanent resident, provided that "(1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to [her] at the time [her] application is filed." § 1255(a). Included in the class of non-immigrants who may petition for LPR status are VWP entrants, but only those who seek adjustment pursuant to an immediate relative petition. § 1255(c)(4).[8] Under the regula-

---

[7]The government does not argue that its understanding of the scope of the VWP no-contest clause is entitled to *Chevron* deference. *Cf. NRDC v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005).

[8]This express right given to VWP entrants is more specific than the broad no-contest language used in the VWP governing statute. *See NLRB v. A-Plus Roofing, Inc.*, 39 F.3d 1410, 1415 (9th Cir. 1994) ("It is a well-settled canon of statutory interpretation that specific provisions prevail over general provisions.")

tory regime associated with adjustment of status, alien applicants are afforded various procedural benefits. Among these benefits, an applicant "retains the right to renew his or her application" if it has been denied. 8 C.F.R. § 245.2(a)(5). If the adjustment of status application is renewed after removal proceedings have been initiated, as would have been the procedure in Mrs. Freeman's situation, an IJ rather than the district director would review and rule upon the application. *See Agyeman v. INS*, 296 F.3d 871, 879 (9th Cir. 2002); 8 C.F.R. § 245.2(a)(1).

**[4]** With respect to these renewal and review procedures, there is no exception in the statute or regulations for aliens who are in the United States under any particular status; the procedures apply to any applicant for adjustment of status. Nor does the VWP no-contest clause on its face clearly exempt VWP visitors from these procedures. *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply . . . ."). Indeed, having granted VWP visitors the right to seek an adjustment of status, it makes no sense for Congress to have intended that these preferred visitors — by definition, citizens of certain *favored* countries — should have second-class status once they enter into the adjustment of status process. *See Crandal v. Ball, Ball & Brosamer*, 99 F.3d 907, 910 (9th Cir. 1996) ("A statute should be read in a manner which attribute[s] a rational purpose to the legislature.").

We decline the government's invitation to read the VWP no-contest restriction into the adjustment of status procedural regime, effectively denying VWP applicants the procedural due process all other applicants enjoy, when Congress has not done so explicitly. Had Congress intended such a result, it could have withheld the adjustment of status right from VWP entrants or specified, within the adjustment of status regime, that they constitute a special class of applicants without the normal rights of appeal and review. *See United States v.*

*Jones*, 204 F.2d 745, 754 (7th Cir. 1953) ("[A] statutory grant of power carries with it, by implication, everything necessary to carry out the power and make it effectual and complete."); *Blue Cross Ass'n v. Harris*, 622 F.2d 972, 978 (8th Cir. 1980) ("It is a commonplace of statutory construction that a legislative grant of power carries with it the right to use the means and instrumentalities necessary to the beneficial exercise of that power."). Accordingly, alleged errors in DHS's adjudication of Mrs. Freeman's application for LPR status should be subject to review as part of the adjustment of status process, and not foreclosed by the VWP no-contest clause.

Moreover, the purpose of the adjustment of status procedures is best served by allowing VWP entrants — like Mrs. Freeman — the right to contest their summary denial without having to leave the United States first.[9] "The adjustment procedure of section 245 was specifically designed to obviate the need for departure and reentry in the cases of aliens temporarily in the United States. . . . It seems clear that section 245 was intended to . . . permit nonimmigrants to attain permanent resident status without leaving the United States." *Matter of S—*, 9 I. & N. Dec. 548, 553-54 (BIA 1962) (internal citation and quotation marks omitted).

Finally, the agency's own actions are relevant to and consistent with our interpretation of the scope of the VWP no-contest clause. *Cf. Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1146 n.11 (9th Cir. 2001) ("Nor do we owe deference

---

[9]We are not persuaded by the government's argument that allowing Mrs. Freeman to escape the no-contest clause (even if only to renew or review her adjustment of status application prior to being removed) would counter the purpose of the VWP, which was to avoid the potentially onerous and numerous proceedings that would otherwise occur when DHS attempts to remove those who have overstayed their 90-day visas. Not only will there likely be a small percentage of VWP entrants in Mrs. Freeman's position, but Congress itself granted the adjustment of status right to these aliens. There is no reason to suspect that Congress failed to appreciate the consequences of its act.

to the interpretation of the statute now advocated by the Secretary's counsel — newly minted, it seems, for this lawsuit, and inconsistent with prior agency actions — as we ordinarily will not defer to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.") (internal quotation marks and citation omitted.) After filing her adjustment of status application, Mrs. Freeman received work authorization, suggesting that the immigration authorities no longer considered her a VWP entrant, but instead treated her like any other adjustment of status applicant, including no longer being subject to a 90-day stay limit. *See* 8 U.S.C. § 1187(a)(1) (describing a VWP entrant as a "tourist"); § 1101(a)(15)(B) (describing a VWP entrant as "an alien (other than one coming for the purpose of study or of performing skilled or unskilled labor . . .) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure.").

**[5]** Based on § 1255(c)(4)'s grant of the right to VWP entrants to adjust their status, reinforced by the statute's purpose and the agency's granting of her work permit, we conclude that upon the proper filing of an adjustment of status application, Mrs. Freeman was assimilated into the adjustment of status procedural regime. Her rights to review of her application — including review of the DHS director's determination of her status as a spouse — were not subject to the Visa Waiver Program's no-contest clause.

## III. Adjustment of Status

### A. Jurisdiction

"Although the parties did not raise the question of our jurisdiction, we have raised it sua sponte, as we must." *WMX Tech. Inc. v. Miller*, 104 F.3d 1133, 1135 (9th Cir. 1997). Notwithstanding the REAL ID Act's limitation on appellate review, *see* § 1252, we conclude that we have jurisdiction to

review Mrs. Freeman's purely legal claim that the district director violated her due process rights by improperly interpreting § 1151(b)(2)(A)(i) to determine that she was no longer the "spouse" of a U.S. citizen and therefore not entitled to adjustment of status. *See Wong v. INS*, 373 F.3d 952, 963 (9th Cir. 2004) ("[D]ecisions made on a purely legal basis may be reviewed, as they do not turn on discretionary judgment. . . . [The § 1252(a)(2)(B) bar on review of discretionary decisions does not apply to cases] rais[ing] only constitutional or purely legal, nondiscretionary challenges to the decisions in question.").

Purely legal questions, such as the proper definition of "spouse" under § 1151(b)(2)(A)(i), are reviewed de novo. *See De Martinez v. Ashcroft*, 374 F.3d 759, 761 (9th Cir. 2004).

B.   Immediate Relative Definition

**[6]** Under § 1151, a United States citizen can petition the immigration authorities to adjust the status of an alien who is an immediate relative to that of a lawful permanent resident. "Immediate relative" is a defined term, as set forth in § 1151(b)(2)(A)(i):

> For purposes of this subsection, the term "immediate relatives" means the children, spouses, and parents of a citizen of the United States, except that, in the case of parents, such citizens shall be at least 21 years of age. In the case of an alien who was the spouse of a citizen of the United States for at least 2 years at the time of the citizen's death and was not legally separated from the citizen at the time of the citizen's death, the alien (and each child of the alien) shall be considered, for purposes of this subsection, to remain an immediate relative after the date of the citizen's death but only if the spouse files a petition under section 204(a)(1)(A)(ii) of this title within 2

years after such date and only until the date the spouse remarries.

The government, relying primarily on the statute's *second* sentence ("In the case of an alien who was the spouse of a citizen . . . ."), reads § 1151(b)(2)(A)(i) as "requir[ing] that in order to be an 'immediate relative' under immigration law the alien 'spouse' (wife) must have been married to the United States citizen 'spouse' (husband) 'for at least 2 years at the time of the citizen's death.' " Under the government's proffered reading, if the citizen spouse dies before the second anniversary of the qualifying marriage, the alien spouse is no longer considered a "spouse" and is no longer entitled to an adjustment of status.

Mrs. Freeman disputes the government's reading. Relying on the *first* sentence of the statute ("For purposes of this section, the term 'immediate relative' means the children, spouses, and parents . . . ."), she argues that she qualified for adjustment of status as an immediate relative — *i.e.*, a spouse — because of her marriage to a U.S. citizen at the time her husband (and she) filed the forms required to initiate the adjustment of status process. She further argues that the statute does not impose a two-year marriage requirement to be considered an immediate-relative spouse, nor does it void that spousal status upon her husband's death. To the extent the second sentence the government invokes is relevant, it simply grants an alien spouse whose deceased citizen spouse had *not* filed an I-130 the right to self-petition so long as the parties were married for two years prior to the citizen's death.

## C. *Chevron* Deference

**[7]** The question for this court is which reading of the statute is correct — the government's or Mrs. Freeman's. We are mindful that the answer "implicat[es] 'an agency's construction of a statute which it administers,' " and we must initially determine whether, and to what extent, *Chevron* deference is

due. *INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999) (quoting *Chevron v. NRDC*, 467 U.S. 837, 842 1984)).

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. . . . [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron*, 467 U.S. at 842-43 (footnote omitted). "*Chevron* deference, however, is not accorded merely because the statute is ambiguous and an administrative official is involved." *Gonzales v. Oregon*, 126 S. Ct. 904, 916 (2005). "We should not defer to an agency's interpretation of a statute if Congress's intent can be clearly ascertained through analysis of the language, purpose and structure of the statute." *NRDC v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877 (9th Cir. 2005).

Here, the district director relied on *In re Varela*, 13 I. & N. Dec. 453, 454 (BIA 1970), in which the BIA summarily ruled that by the time the non-citizen wife's adjustment of status petition was being determined, she was no longer a spouse of a United States citizen under § 1151 because her husband's "death had stripped her of that status." Aside from *Varela*'s lack of statutory analysis, the opinion's weight is further undercut by the BIA's later finding that it was "extra-jurisdictional."[10] Beyond this, the BIA has not otherwise

---

[10]*See Matter of Sano*, 19 I. & N. Dec. 299 (BIA 1985). Consequently, we are cautioned against granting significant deference to the BIA's con-

addressed the statutory question before us. In any event, the BIA's interpretation, to the extent it is entitled to some deference, is not a permissible construction of the statute. *See Hernandez-Guadarrama v. Ashcroft*, 394 F.3d 674, 678 (9th Cir. 2005) ("If we conclude that the statute is silent or ambiguous with respect to the specific issue before us, we must respect the agency's construction of the statute so long as it is permissible.").

We conclude, through our review of the language, structure, purpose and application of the statute, that Congress clearly intended an alien widow whose citizen spouse has filed the necessary forms *to be* and *to remain* an immediate relative (spouse) for purposes of § 1151(b)(2)(A)(i), even if the citizen spouse dies within two years of the marriage. As such, the widowed spouse remains entitled to the process that flows from a properly filed adjustment of status application. The two-year durational language in the second sentence of § 1151(b)(2)(A)(i) grants a separate right to an alien widow to self-petition, within two years of the citizen spouse's death, by filing a form I-360 where the citizen spouse had not filed an immediate relative petition prior to his death. Therefore, Mrs. Freeman, having filed all necessary forms, must be considered a spouse for purposes of her adjustment of status application.

D. Language, Structure, Purpose and Application of the Adjustment of Status Process

"The starting point for our interpretation of a statute is always its language." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989). "Interpretation of a word or phrase depends upon reading the whole statutory text, consid-

clusion in *In re Varela. See Lagandaon v. Ashcroft*, 383 F.3d 983, 987 n.2 (9th Cir. 2004) ("We have also indicated that nonprecedential BIA decisions might receive less deference than those designated as precedential.").

ering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Dolan v. United States Postal Service*, 126 S. Ct. 1252, 1257 (2006). In understanding and applying a regulatory scheme, we should interpret statutes to be coherent and internally consistent. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000); *Mutschler v. Peoples Nat'l Bank of Wash.*, 607 F.2d 274, 276 (9th Cir. 1979).

**[8]** The language of the first sentence of § 1151(b)(2)(A)(i), which sets out the general definition of immediate relative, is straightforward and succinct, and expressly includes "spouses." Only alien "parents" are subject to any limitation, with the grant of immediate relative status being restricted to those whose citizen child is at least 21 years of age. There is no comparable qualifier to be a "spouse" — that is, a requirement that the marriage must have existed for at least two years. "This fact only underscores our duty to refrain from reading a phrase into a statute when Congress has left it out. Where Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (internal citation and quotation marks omitted). The words of Congress are clear and we presume that Congress meant precisely what it said: "The term 'immediate relative[ ]' means the . . . spouse[ ] . . . of a citizen of the United States," without exception. § 1151(b)(2)(A)(i); *see also BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there." (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992))). Under the express terms of the statute, Mrs. Freeman qualified as the *spouse* of a U.S. citizen when she and her husband petitioned for adjustment of status, and absent a clear statutory provision voiding her spousal status upon her husband's untimely death, she remains a *surviving*

spouse. Neither the definition of immediate relative nor the text and structure of the adjustment of status regime provides support for the government's position that Mrs. Freeman should be stripped of her spousal status.

Before we address (and reject) the government's attempt to read the second sentence of § 1151(b)(2)(A)(i) as implicitly importing a two-year requirement into the definition of spouse, we turn to the structure of the adjustment of status procedure that was initiated when the Freeman's filed their adjustment of status forms. The immigration statute provides that "[a]ny citizen of the United States claiming that an alien is entitled to . . . immediate relative status under section 1151(b)(2)(A)(i) of this title may file a petition with the Attorney General for such classification." § 1154(a)(1)(A)(i). A citizen spouse is generally eligible, without exception, to file a petition on behalf of his alien spouse so long as the marriage was not fraudulent and the marriage was not entered into "while the alien was in exclusion, deportation, or removal proceedings, or judicial proceedings relating thereto." 8 C.F.R. § 204.2(a)(1)(ii) - (iii); *see also Dabaghian v. Civiletti*, 607 F.2d 868, 869 (9th Cir. 1979) ("If a marriage is not sham or fraudulent from its inception, it is valid for the purposes of determining eligibility for adjustment of status under § 245 of the [Immigration and Nationality] Act until it is legally dissolved."). The critical form the citizen spouse must file in order to seek re-classification of his alien spouse is the Form I-130, Petition for Alien Relative, establishing his citizenship and that the alien seeking adjustment is an immediate relative. *See* 8 C.F.R. § 204.1(a)(1). Along with the citizen's filing, the alien must file a Form I-485 seeking adjustment of status to that of lawful permanent resident, relying on the citizen's petition attesting to the alien's status as his spouse. *See* § 1255(a).[11] Upon submission of these two forms, no addi-

---

[11]Section 1255(a) provides

The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney Gen-

tional forms are expected to be filed by the citizen and alien spouses.[12] The government points to nothing in this procedure suggesting that the properly filed forms are entirely voided upon the citizen petitioner's death.

It is undisputed that Mr. and Mrs. Freeman adequately followed this procedure and filed the necessary forms (I-130 and I-485), and that their marriage was neither a sham nor fraudulent. The government also tells us that, had DHS addressed the Freemans' application before Mr. Freeman died, the adjustment of status could have been granted even though they had not been married for two years. Nonetheless, by the time DHS did reach the petition Mrs. Freeman was a widow and, in DHS's view, no longer a spouse eligible for LPR status because her marriage did not meet a two-year requirement. The government infers this two-year requirement from the second sentence of § 1151(b)(2)(A)(i), which it reads as governing all cases where the immigration authorities have *not yet* adjudicated a widow's pending adjustment of status application. The government's position is that regardless of there being no two-year minimum to qualify either as a spouse for filing or for being granted an adjustment of status, if the citizen spouse dies short of a two-year marriage and before DHS has acted, his alien spouse's opportunity for adjustment of sta-

---

     eral . . . to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

[12]We note that proper filing and approval of the forms do not themselves automatically entitle Mrs. Freeman to adjustment of status. Rather, "[w]hile an I-130 establishes eligibility for status, the Attorney General — or in the context of deportation proceedings, the IJ — must still decide to accord the status." *Agyeman,* 296 F.3d at 879. Nonetheless, the purpose of our opinion here is to ensure that in making the decision to accord status, the immigration authorities are properly construing the law that they have the discretion to apply.

tus dies with him because the alien is no longer an immediate relative of a citizen.[13] We cannot accept this untenable interpretation. *Cf. Dabaghian*, 607 F.2d at 871 ("The word 'spouses' in § [1151(b)(2)(A)(i)] includes the parties to all marriages that are legally valid and not sham. There is no exception for marriages that the INS thinks are 'factually dead' at the time of adjustment.").

The more logical and statutorily substantiated interpretation of the second sentence is that it applies to those aliens whose citizen spouses did not initiate an adjustment of status proceeding before they died, granting such surviving spouses a beneficial right to file an immediate relative petition even without a living citizen spouse to vouch for the fact of the marriage.[14] The immigration regulations discussing the process to adjust status comport with this reading and offer no support for the government's contention that alien spouses who have filed the necessary forms should have their spousal status voided upon the premature death of their citizen spouses.

8 C.F.R. §§ 204.1-2 lay out the framework for immediate relative petitions and support our conclusion. Sections 204.1(a)(1) and 204.2(a) address when "a United States citizen . . . may file a petition on behalf of a spouse," a procedure

---

[13]The government has not pointed to anything in the immigration laws that gives the two-year anniversary such talismanic significance in this context. We recognize that § 1227(a)(1)(G) creates a presumption of fraud where an alien spouse has received an adjustment of status (pursuant to an immediate relative petition made by the citizen spouse) prior to the two-year anniversary of the marriage and the marriage is terminated within two-years of the alien becoming an LPR. However, the government does not argue that Mrs. Freeman's marriage was anything but legitimate.

[14]It is relevant that Congress introduced the two-year durational requirement for certain alien widows in a separate sentence of the statute. The "grammatical structure of th[is] statute" suggests that the second sentence "stands independent" of the first and does not qualify the general definition of spouse. *See United States v. Ron Pair Enterprises*, 489 U.S. 235, 241-42 (1989).

the Freemans complied with here. On the other hand, sections 204.1(a)(2) and 204.2(b), separately delineate when a "widow or widower of a United States citizen *self-petitioning*"[15] "may file a petition and be classified as an immediate relative" (emphasis added), essentially tracking the second sentence of § 1151(b)(2)(A)(i).[16] The distinction the regulations draw between the rights of a citizen spouse to petition as compared to those of an alien widow to *self-petition* is consistent with a congressional intent to create two different processes, such that one or the other applies — either the citizen spouse petitions or, if he dies without doing so, the alien widow may do so.[17] There is no provision that the citizen spouse's pending petition (and consequently the alien spouse's immediate relative status) is voided on his death, requiring the widow to start over with her own self-petition.

Indeed, as noted above, the government concedes that it had the power to grant the Freemans' application prior to Mr.

[15]An alien "widow or widower of a United States citizen self-petitioning under section 1154(a)(1)(A)(ii) of the Act as an immediate relative . . . must file a Form I-360, Petition for Amerasian, Widow, or Special Immigrant." 8 C.F.R. § 204.1(a)(2). Because Mr. Freeman had already filed a Form I-130, as required by 8 C.F.R. § 204.1(a)(1), there was no reason for Mrs. Freeman to self-petition by filing an I-360.

[16]A widow or widower may self-petition for classification only if "she had been married for at least two years to a United States citizen," "the petition is filed within two years of the death of the citizen spouse," "the alien petitioner and the citizen spouse were not legally separated at the time of the citizen's death," and "the alien spouse has not remarried." 8 C.F.R. §§ 204.2(b)(i)-(iv).

[17]8 U.S.C. § 1154(a)(1)(A)(ii) states, "An alien spouse described in the second sentence of section 1151(b)(2)(A)(i) *also* may file a petition with the Attorney General under this subparagraph for classification of the alien (and the alien's children) under such section." (emphasis added.) The inclusion of the word "also" in this subsection, as compared to the right given to living citizen spouses in § 1154(a)(1)(A)(i) (i.e., to file a petition on behalf of their alien spouse), further establishes that the right of self-petition is given to a select group of alien widows as an *alternative* to their citizen spouse's I-130 filing.

Freeman's death (and the Freemans' second anniversary). Had it done so, Mrs. Freeman's LPR could not then have been voided by her husband's death, as the statute expressly states. *See* § 1186a(a), (b)(1) (providing that an alien spouse who receives permanent resident status as an immediate relative before the second anniversary of her qualifying marriage does so on a conditional basis, and if the Attorney General determines that prior to the second anniversary of the alien's obtaining status the alien's marriage "has been judicially annulled or terminated, *other than through the death of a spouse*," the Attorney General "shall terminate the permanent resident status of the alien." (emphasis added)). This is compelling evidence that Congress did not intend its provision for a widow's self-petition for adjustment of status to have an implicit collateral consequence of terminating a spouse's already pending petition — particularly when the effect would be to foreclose a grieving widow from any adjustment at all "through the death of [her] spouse."

[9] Read cohesively, as they must be, the immigration laws — and § 1151 in particular — provide varying rights depending on the procedures employed and requirements fulfilled by those seeking an adjustment of status, and say nothing of voiding the pending application properly filed by Mrs. Freeman and her late husband. Section 1151's definition of immediate relative includes those spouses, like Mrs. Freeman, whose citizen spouses have filed Form I-130. When the citizen spouse dies *after* he has filed Form I-130 and otherwise satisfied the necessary requirements, the duration of the marriage is of no consequence (unless DHS finds the marriage to be a sham or otherwise fraudulent), and the surviving alien spouse remains a qualified immediate relative. However, when a citizen spouse dies *before* initiating an adjustment of status proceeding on behalf of his alien spouse, Congress has — in the second sentence of § 1151(b)(2)(A)(i) — granted the survivor a qualified right to self-petition on her own behalf. In the self-petition context, Congress required a minimum two-year marriage as well as a filing within two years of her

husband's death.[18] This interpretation harmonizes and is consistent with the language and structure of the statute and related provisions of the immigration law. *See Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1474 (9th Cir. 1987) ("The words of a statute should be harmonized internally and with each other to the extent possible.").

Mrs. Freeman "completed all the formalities required for an adjustment of [her] status, . . . but the immigration authorities had, through no fault of [her or her husband's], failed as yet to act on [her husband's] petition." *Benslimane v. Gonzales*, 430 F.3d 828, 832 (7th Cir. 2005); *see also INS v. Miranda*, 459 U.S. 14, 15 (1982) (per curiam) ("Section 245(a) of the Immigration and Nationality Act conditions the granting of permanent resident status to an alien on the immediate availability of an immigrant visa. [The citizen spouse's] petition, if approved, would have satisfied this condition."). It is understandable that the immigration authorities may require a considerable amount of time to process the many applications that come before them; however, an alien's status as a qualified spouse should not turn on whether DHS happens to reach a pending application before the citizen spouse happens to die. *See Clinton v. New York*, 524 U.S. 417, 429 (1998) ("Acceptance of the government's . . . reading . . . would produce an absurd and unjust result which Congress could not have intended.") (internal citation and quotation marks omitted).

## IV. CONCLUSION

**[10]** The government's attempt to apply the VWP's no-contest clause to Mrs. Freeman's adjustment of status proceeding and its contention that her spousal status was stripped by her husband's untimely death are "contrary to congressio-

---

[18]Congress could rationally have wanted some objective evidence of a valid marriage in the case of a widow whose citizen spouse had taken no action to adjust her status during his lifetime.

nal intent and frustrate congressional policy." *Akhtar v. Burzynski*, 384 F.3d 1193, 1202 (9th Cir. 2004). First, the adjustment of status regime makes clear that a VWP entrant is assimilated into the procedural world of adjustment of status applicants once an immediate relative petition is properly filed, and not relegated to lesser rights by virtue of the VWP's no-contest clause. Second, given the text, structure and context of § 1151(b)(2)(A)(i) — further illuminated by DHS's willingness to grant LPR applications regardless of a marriage's duration — deference to the government's interpretation of "spouse" is not warranted. Mrs. Freeman remains an immediate relative (spouse) of a U.S. citizen and her adjustment of status application should be adjudicated accordingly.

**[11]** Accordingly we GRANT Mrs. Freeman's petition for review and REMAND to the district director for further consideration consistent with this opinion.[19] The removal order entered against Mrs. Freeman is VACATED.[20]

## PETITION GRANTED AND REMANDED.

---

[19]Remand to the district director is appropriate in this case because "the authority to adjudicate immediate relative preference petitions properly rests with the Attorney General (who has, in turn, delegated it to the district directors), and not with the BIA or immigration judge." *Dielmann v. INS*, 34 F.3d 851, 853 (9th Cir. 1994).

[20]Because we hold that Mrs. Freeman is a spouse for purposes of 8 U.S.C. § 1151(b)(2)(A)(i), we need not reach her equal protection claim.