In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-1069

MOHAMMED BAYO,

*Petitioner-Appellant*,

*v.*

JANET A. NAPOLITANO,
Secretary of Homeland Security,

*Respondent-Appellee.*

On Petition for Review of a Final Order of the
Department of Homeland Security.
No. A89-340-905

ARGUED MAY 13, 2009—DECIDED JANUARY 20, 2010

Before EASTERBROOK, *Chief Judge*, and BAUER, POSNER,
COFFEY, FLAUM, KANNE, ROVNER, WOOD, EVANS, WILLIAMS,
SYKES, and TINDER, *Circuit Judges.**

WOOD, *Circuit Judge.* Mohammed Bayo is not the most
sympathetic of litigants. He is a citizen of Guinea, but

_____

* Circuit Judge Hamilton took no part in the consideration or
decision of this case.

he stole a Belgian passport and used it to enter the United States fraudulently. Why, one might ask, would he go to the trouble of doing this? Guineans are entitled to visit the United States, provided they observe the required formalities. But Guinea is not one of the 35 countries that comes within the State Department's Visa Waiver Program ("VWP"); Belgium is. See Visa Waiver Program (VWP) http://www.travel.state.gov/visa/temp/ without/without_1990.html#countries (last visited Jan. 15, 2010). Bayo's ploy enabled him to enter with a minimum of bureaucratic fuss and then to evade detection for more than four years.

His luck ran out only when he pushed it by petitioning for adjustment of status based on his marriage to an American citizen. The government knew that *someone* had entered with the illegal Belgian passport, and Bayo's petition enabled it to connect that passport to him. At that point, the Department of Homeland Security ("DHS") promptly processed his removal without a hearing, as it normally would with any legitimate VWP participant who overstays his visit. Summary procedures are the *quid pro quo* for the United States government's waiver of the normal visa requirements. Bayo's waiver was memorialized in the Form I-94W ("VWP waiver") that he signed upon his arrival in the United States. The wrinkle is that the form was in English, and Bayo asserts that he speaks only French.

Before us is Bayo's petition for review of DHS's administrative order of removal. See 8 U.S.C. § 1252(a)(1). Bayo offers three reasons why we should grant the petition

and remand the case for plenary removal proceedings before an immigration judge ("IJ"). (The advantage of such proceedings is that he would be able, in principle, to seek relief from removal in them; such relief is not available in the summary VWP process.) First, Bayo contends that the VWP waiver he signed is void *ab initio*, because he is a Guinean citizen and the program cannot be applied in any way to citizens of non-VWP countries. Second, he argues that his lack of English proficiency renders invalid the particular waiver he signed, as he did not know what he was signing, and (in his view) his waiver must be assessed according to the familiar knowing-and-voluntary standard that applies to constitutional rights. Third, he asserts that even if the waiver is valid, he should nevertheless be permitted to pursue his adjustment-of-status application. Although there is merit in some of his points, in the end we conclude that he cannot demonstrate prejudice from the errors that occurred here. We therefore deny his petition for review.

## I

### A

"The Visa Waiver Pilot Program was established by Congress to determine if a visa waiver provision could facilitate international travel and promote the more effective use of the resources of affected government agencies. . . ." Visa Waiver Pilot Program, 53 Fed. Reg. 24,898, 24,898 (June 30, 1988). Only citizens of VWP countries may participate in the Program, and just 35

countries currently qualify. See 8 C.F.R. § 217.2(a). The VWP operates through a reciprocal waiver arrangement: the United States waives its visa requirement, and in exchange, the visitor waives her right to contest admissibility determinations or removal (except for asylum). See 8 U.S.C. § 1187(a), (b). VWP entrants are also treated differently, and perhaps more favorably, when they apply for asylum, because they are entitled to bypass the credible-fear process and proceed directly to an IJ. See 8 C.F.R. § 217.4(b). Bayo has not argued that he would be entitled to asylum, and so we have no need to discuss that possibility further.

At the time of Bayo's entry, the terms of the VWP were memorialized in Form I-94W, which had to be filled out and signed by all VWP entrants upon their arrival in the United States. It describes the visitor's waiver of rights as follows:

> **WAIVER OF RIGHTS:** I hereby waive any rights to review or appeal of an immigration officer's determination as to my admissibility, or to contest, other than on the basis of an application for asylum, any action in deportation.

The Form further elaborates on the conditions that apply to the visitor's sojourn in the United States:

> **WARNING:** You may not accept unauthorized employment; or attend school; or represent the foreign information media during your visit under this program. You are authorized to stay in the U.S. for 90 days or less. You may not apply for: 1) a change of nonimmigrant status; 2) adjustment of status to

temporary or permanent resident, unless eligible under section 201(b) of the INA; or 3) an extension of stay. Violation of these terms will subject you to deportation.

In response to the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, 121 Stat. 266, the DHS recently implemented the new Electronic System for Travel Authorization ("ESTA"), which requires visitors to fill out the I-94W form online in advance of travel to the United States. See The Electronic System for Travel Authorization: Mandatory Compliance Required for Travel Under the Visa Waiver Program, 73 Fed. Reg. 67,354 (Nov. 13, 2008). The I-94W form is now offered in 21 different languages on the ESTA website. See Welcome to ESTA, https://esta.cbp.dhs.gov (last visited Jan. 15, 2010).

B

As we noted at the outset, Bayo is a native and citizen of Guinea, and Guinea is not a VWP country. Belgium is, however, and Bayo acquired a stolen passport from that country that enabled him to enter the United States without a proper visa on July 12, 2002. Upon arrival at Newark Airport, Bayo signed an English-language Form I-94W, even though he asserts that he neither speaks nor reads English. Bayo overstayed the 90 days to which an ordinary VWP traveler is entitled and eventually settled in Indianapolis, Indiana, where he met Tatiana Sia, a United States citizen. On April 21, 2006, he

married her. He then sought an adjustment of status to legal permanent resident status based on that marriage.

On September 26, 2006, Immigration and Customs Enforcement ("ICE") received information from the National Security Investigation Division, Compliance Enforcement Unit that Bayo had entered the United States illegally under a Belgian passport. Cross-referencing this information with its immigration files enabled ICE to locate Bayo's pending I-130 and I-485 applications for lawful permanent residence status based on marriage. ICE officers visited Bayo's home on November 20, 2006, and questioned him about his immigration status. He freely admitted to using the stolen passport and turned it over. The DHS then promptly ordered Bayo's removal, selecting as the basis for its action Bayo's overstay under the VWP. (Fraud was another potential removal ground.) In accordance with the terms of the I-94W form that he signed, Bayo received no removal hearing.

## II

As a preliminary matter, we must briefly discuss our authority to act in this case, as the VWP waiver Bayo signed might be read to preclude judicial review. The first two issues that Bayo raises challenge the fundamental validity of the VWP waiver itself; his third point concerns a potential exception to the waiver. The scope of our review is narrow, but 8 U.S.C. § 1252 confers authority on the courts of appeals to review VWP decisions, among others. (Other mechanisms, including notably habeas corpus, are no longer open to persons resisting

VWP removal orders. See 8 U.S.C. § 1252(a)(5).) At a minimum, we may consider whether the statutory criteria on which the VWP rests have been met. Compare *Morales-Morales v. Ashcroft,* 384 F.3d 418, 421 (7th Cir. 2004) (court has jurisdiction to determine whether a particular alien's claim falls within the scope of a jurisdiction-stripping statute); see generally *United States v. Ruiz*, 536 U.S. 622, 627 (2002) ("[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction."). The predicate questions we may look at here include whether Bayo's VWP waiver is valid and whether he may invoke a valid exception to his waiver. We may not consider more generally whether Bayo might be entitled to stay in the country on some other ground, such as, for example, by adjusting his status based on his marriage.

These limitations define our inquiry in this appeal. Three questions are properly before us: first, may an alien who is not eligible for the VWP, but who enters using fraudulent documents that trigger use of the VWP, be held to the terms of the VWP waiver; second, what is the standard for the waiver of the procedural rights that are covered by the VWP; and third, assuming a valid VWP waiver, does an alien who entered under the VWP and then overstayed have an independent right to adjust his status on the basis of marriage to a United States citizen?

A

In their original briefs, the parties did not address the question whether Bayo's VWP waiver is void because he

is not a citizen of a VWP country. Because we thought that this question was potentially dispositive of the case, we requested supplemental briefing on it.

In his supplemental brief, Bayo notes that the statutory language establishing the VWP does not say anything about nationals of non-VWP countries possibly being eligible for the program. He infers from that silence that the VWP is entirely inapplicable to citizens of non-VWP countries. He then reasons that he cannot be held to the terms of a VWP waiver that never should have been before him in the first place. The final step in his argument is the assertion that he must therefore be subject to ordinary removal procedures (including a hearing before an IJ) just as if he had never entered under the VWP. See 8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."); see also 8 U.S.C. § 1229a(a)(3) ("[A] proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.").

The government concedes that the statutory language establishing the VWP does not specifically mention the admission of aliens from non-VWP countries, but it does not attach such an elaborate set of consequences to this silence. It takes the position that the VWP regulations, which (it says) are entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), address the possibility of aliens

fraudulently entering under the program. Those regulations also, in its view, mean that someone in Bayo's position may be held to the terms of the VWP waiver. The government further appeals to the background principle of immigration law under which aliens should generally be held to the terms of their entry. To hold otherwise, the government argues, would allow savvy aliens to manipulate the VWP and would hinder the government's attempts to remove promptly aliens who have abused the system.

To begin, we must reject Bayo's contention that statutory silence tells us very much. See *Negusie v. Holder*, 129 S. Ct. 1159, 1164 (2009) (noting that statutory "silence is not conclusive"). Silence might signify something about the scope of a statute, but it equally might highlight an issue that Congress did not anticipate or that it chose to leave open. It is under these circumstances that Congress has implicitly delegated authority to the relevant agency to resolve the issue. See *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("[A]mbiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.").

In our view, the Attorney General appropriately has acted here to clarify the scope of the VWP as it pertains to certain abuses of the program, insofar as the VWP regulations address the situation of ineligible aliens entering fraudulently under the VWP. See 8 C.F.R. § 217.4(a) (mentioning VWP applicants who might be

ineligible or who present fraudulent documents); 8 C.F.R. § 217.4(b) (noting that aliens who have been admitted under the VWP are deportable under the program if they are deportable under one of the grounds listed in 8 U.S.C. § 1227). The Board of Immigration Appeals also has interpreted the regulations to apply to VWP-ineligible aliens. See *In re Kanagasundram*, 22 I. & N. Dec. 963, 964 (B.I.A. 1999) ("[T]he provisions of 8 C.F.R. § 217.4 are not limited to aliens who are actually nationals of VWPP designated countries, but specifically encompass individuals who present fraudulent and counterfeit travel documents from such countries."); see also *Zine v. Mukasey*, 517 F.3d 535, 542-43 (8th Cir. 2008) (holding that aliens entering under the VWP should be held to the VWP waiver's terms).

In assessing those regulations, our first question is whether we find the statute ambiguous. As we indicated earlier, we do: the fact that it says nothing about nationals of non-VWP countries creates the ambiguity that drives both Bayo's and the government's arguments. The VWP regulations answer that ambiguity by applying the terms of the program to those who enter under the VWP, even if they are ineligible for it. Our only task under *Chevron* is to determine whether the Attorney General's interpretation, as expressed in the VWP regulations, is reasonable. We find that it is. There is little reason to think that Congress would have wanted to confer the benefits of the VWP on ineligible aliens while sparing them the costs of entering under the Program. We say this in full recognition of the fact that applying the terms of the VWP to ineligible aliens

may also confer on them the possible benefit in asylum cases of being able to skip the credible-fear interview and proceed directly to an IJ. See *Kanagasundram*, 22 I. & N. Dec. at 964. But the fact that there may be some benefits to the ineligible aliens as well as burdens simply means that the Attorney General had to balance several factors in the course of interpreting the statute. He was entitled, in doing so, to adopt an approach that preserves the government's ability to remove aliens who fraudulently enter under the VWP just as promptly as it can remove legitimate VWP entrants.

Our conclusion on this issue is in line with our earlier decisions. We have dismissed attempts by aliens to take control of their removal proceedings for overstay by pleading fraud. See *Milande v. INS*, 484 F.2d 774, 776 (7th Cir. 1973) ("To prove overstay, the respondent need only show a nonimmigrant's admission for a temporary period, that the period has elapsed, and that the nonimmigrant has not departed. Any fraud or misrepresentation at time of entry is irrelevant to the charge of overstay . . . ."). We have also safeguarded the government's ability to select the ground on which to remove aliens who are here illegally. See *Ntovas v. Ahrens*, 276 F.2d 483, 484 (7th Cir. 1960) ("In the administrative proceedings the ground selected and relied upon by the government was not fraud or misrepresentation and plaintiff has not the power to substitute for his own convenience a ground not involved in the deportation proceedings."). The government in this case was therefore entitled to select overstay under the terms of the VWP as the ground for removing Bayo.

B

Immigration law draws a bright line between "an alien who has effected an entry into the United States and one who has never entered." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). We acknowledge that those who stand at the threshold of admission are subject to special rules. See *Shaughnessy v. United States*, 345 U.S. 206, 212 (1953) ("[A]n alien on the threshold of initial entry stands on a different footing: Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.") (internal quotation marks omitted). The parties, however, do not dispute that Bayo has entered the United States, and so the "entry fiction" doctrine does not apply to him. Once he crossed the border, Bayo became entitled to certain constitutional rights, including the right to due process. See *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); *Yick Wo v. Hopkins*, 118 U.S. 356, 368 (1886) ("The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. . . . [Its] provisions are universal in their application, to all persons within the territorial jurisdiction.").

The government argues that Bayo waived these rights by signing the VWP form, but Bayo counters that the waiver he signed is invalid because he did not understand it. If the VWP waiver were a garden-variety contract, Bayo's argument would almost certainly fail.

See *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir. 1992) ("[A] party who agrees to terms in writing without understanding or investigating those terms does so at his own peril."); 27 WILLISTON ON CONTRACTS § 70:113 (4th ed. 2009) ("One who signs or accepts a written contract, in the absence of fraud or other wrongful act on the part of another contracting party, is conclusively presumed to know its contents and to assent to them."). The VWP waiver, however, is no normal contract. It includes a waiver of the right to a full immigration hearing; that waiver implicates both statutory rights and, in the final analysis, the constitutional right to due process.

In criminal cases, courts both "indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . do not presume acquiescence in the loss of fundamental rights." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (internal quotation marks omitted). The Supreme Court also has established constitutional standards for waivers of constitutional rights in civil cases. See *Fuentes v. Shevin*, 407 U.S. 67, 94 n.31 (1972) ("In the civil area, the Court has said that we do not presume acquiescence in the loss of fundamental rights. Indeed, in the civil no less than the criminal area, courts indulge every reasonable presumption against waiver.") (citation and internal quotation marks omitted) (quoting *Ohio Bell Tel. Co. v. Pub. Util. Comm'n*, 301 U.S. 292, 307 (1937) and *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937)). While the Supreme Court has consistently classified deportation proceedings as civil rather than criminal, *e.g. Harisiades v. Shaughnessy*, 342 U.S. 580, 594

(1952), at the same time the "Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to forsake all the bonds formed here and go to a foreign land where he often has no contemporary identification." *Woodby v. INS,* 385 U.S. 276, 285 (1966) (applying criminal law's burden of proof requirement to deportation proceedings). See *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) ("Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most serious one—cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.") We conclude from this that the waiver standard in immigration cases, while perhaps not quite as strict as the one applicable to criminal cases, see *Johnson v. Zerbst*, must reflect the Supreme Court's recognition of the unique character of this area.

Bayo argues that only a waiver of rights that is knowing and voluntary can be effective here, and in support of this position he assumes that the traditional definition of waiver as the "intentional relinquishment or abandonment of a known right" applies. *United States v. Olano,* 507 U.S. 725, 733 (1993). The government, in contrast, argues for what it calls a "presumption" of knowledge, invoking the common-law maxim that knowledge of the law is presumed. See *Cheek v. United States*, 498 U.S. 192, 199 (1991) ("Based on the notion

that the law is definite and knowable, the common law presumed that every person knew the law."); *Dimenski v. INS*, 275 F.3d 574, 578 (7th Cir. 2001) ("In immigration law, as in tax law—and criminal law, too, where knowledge of the law is presumed—the Constitution permits the government to leave people to their own research.") (citation omitted). That presumption, the government argues, satisfies the knowledge requirement of the knowing and voluntary standard, and Bayo does not dispute that he signed the VWP waiver voluntarily—he contests only that he did so knowingly.

We have in the past assumed that a VWP waiver is valid only if it was done knowingly and voluntarily. See *Wigglesworth v. INS*, 319 F.3d 951, 959 (7th Cir. 2003). The government would have us depart from that understanding, substituting a *presumption* of knowledge for the requirement of *actual* knowledge. But this would have the practical effect of eliminating the knowledge requirement altogether—a path we decline to follow for a host of reasons. First, we do not feel free to abandon the presumption against waiver of constitutional rights, see *Fuentes,* 407 U.S. at 94 n.31; compare *Johnson*, 304 U.S. at 464, nor do we think that such a step would be advisable. Second, both the concepts of waiver and the presumption of knowledge of the law are ubiquitous in our legal system; defining their interaction so as to eliminate the knowledge requirement for a valid waiver of constitutional rights would change the law in various contexts not at issue here. Third, adopting a standard that rests solely on voluntariness would lead to absurd results, as it would render all waivers of constitutional

rights signed without coercion valid, regardless of whether the signatory understood a single word on the page. As *amici* point out, this would have a particularly detrimental effect on victims of human trafficking, who often come from VWP countries. See UNITED STATES DEPARTMENT OF JUSTICE, ASSESSMENT OF U.S. GOVERN- MENT EFFORTS TO COMBAT TRAFFICKING IN HUMAN PERSONS IN FISCAL YEAR 2005 3-4 (2006), *available at* http:// www.usdoj.gov/ag/annualreports/tr2006/assessment_of_ efforts_to_combat_tip.pdf (noting that aliens who had received Certification and Eligibility Letters to obtain services and benefits for victims of human trafficking came from several VWP countries, including Czech Republic, Estonia, Hungary, Latvia, and South Korea). These aliens frequently enter the country voluntarily (hoping for employment but often finding hard labor or prostitution) and sign whatever forms that their traf- fickers put in front of them, without understanding the language on the form. Enforcing the terms of the VWP waiver against the victims of human trafficking (when they signed without knowledge) would prevent them from accessing T and U visas. See 8 U.S.C. § 1101(a)(15)(T), (U). To render these provisions inoperative in this way would contravene congressional intent to provide relief to those who have been trafficked.

In sum, we decline to pursue such a radical departure from established law. The only other circuit to have considered this question has come to the same conclu- sion. See *Nose v. Attorney Gen. of United States*, 993 F.2d 75, 78-79 (5th Cir. 1993). The government raises the specter of endless litigation were we to adopt the

knowing and voluntary standard, but it has failed to produce any evidence that this standard has proven unworkable in the Fifth Circuit. This is not for want of time to test the standard, which has been around for more than 15 years. Nor is it because the Fifth Circuit lacks experience with immigration, as Houston is a large port of entry and Texas is a popular destination for nonresident nonimmigrants (a category into which VWP entrants fall). See RANDALL MONGER & MACREADIE BARR, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ANNUAL FLOW REPORT: NONIMMIGRANT ADMISSIONS TO THE UNITED STATES: 2008 6-8 (2009), *available at* http://www.dhs.gov/xlibrary/assets/statistics/publications/ois_ni_fr_2008.pdf. Perhaps most telling is the fact that the Fifth Circuit itself has not found it necessary to change its standard in response to overwhelming litigation or other concerns.

We therefore hold that an alien's waiver through the VWP of the due process rights to which he or she would otherwise be entitled must be done both knowingly and voluntarily. That said, there are a few additional points that must be clarified. Just as we are not inclined to endorse a sea change in the law of waiver, we also do not wish to disturb the understanding that the government is entitled to assume that people know the law. That means, importantly, that immigration officials are under no obligation to provide any form of legal advice to incoming immigrants. See *City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999) (finding that government need not take steps to inform citizens of remedies if information about them is generally available). We also express no

opinion on the procedures the government should adopt in order to ensure that waivers of constitutional rights occur knowingly and voluntarily with respect to language proficiency. Going forward, it seems likely to us that this problem has largely been solved, as the ESTA website allows the traveler to select for the VWP waiver one of 21 languages, presumably those that are spoken in the 35 VWP countries. For a person already here who did not have the ESTA available to her, there are a variety of methods that could be used to adjudicate a claim contesting the knowing and voluntary nature of her waiver, and it is not our role to prescribe any particular system. We trust the executive branch to devise a system that fulfills the goals of fairness, efficiency, and security.

Turning to the current case, we encounter the government's argument that whether Bayo speaks English or French is immaterial, as aliens cannot plead a lack of language proficiency in proceedings like this one. Support for this proposition may be found in language from *The Japanese Immigrant Case*, 189 U.S. 86, 101-02 (1903) ("It is true that she pleads a want of knowledge of our language; that she did not understand the nature and import of the questions propounded to her; that the investigation made was a 'pretended' one; and that she did not, at the time, know that the investigation had reference to her being deported from the country. These considerations cannot justify the intervention of the courts."). The government does not cite this case in any of its briefs. Moreover, this language is *dicta*, as the

Court in *Japanese Immigrant* was concerned that the alien had not followed the proper procedures for bringing her complaint before the executive branch authorities, as was required then:

> [Appellant's arguments] could have been presented to the officer having primary control of such a case, as well as upon an appeal to the Secretary of the Treasury, who had power to order another investigation if that course was demanded by law or by the ends of justice. It is not to be assumed that either would have refused a second or fuller investigation, if a proper application and showing for one had been made by or for the appellant. Whether further investigation should have been ordered was for the officers, charged with the execution of the statutes, to determine. Their action in that regard is not subject to judicial review. *Suffice it to say, it does not appear that appellant was denied an opportunity to be heard.* And as no appeal was taken to the Secretary from the decision of the Immigration Inspector, that decision was final and conclusive.

*Id.* at 102 (emphasis added).

Even though none of the parties has explored the limits of *Japanese Immigrant*, we think it important to explain why we do not find it to be dispositive here. First, for the reasons we have already explained, this court has authority to resolve Bayo's petition, unlike the situation in *Japanese Immigrant*. Second, the alien in *Japanese Immigrant* was asserting that her lack of knowl-

edge of English (and her other disabilities) entitled her to a broader scope of judicial review than the statute afforded. Focusing on the allocation of responsibility between the immigration officers and the courts, the Supreme Court rejected her argument. Bayo is not claiming that his asserted lack of command of the English language alters the scope of judicial review. Instead, the question is whether he may raise certain arguments in a proceeding authorized by the governing statute. Properly in court, he is entitled to raise as one of his arguments whether, for any reason (including but not limited to language problems) his VWP waiver was unknowing and therefore invalid. The government does not dispute our jurisdiction to consider final orders of removal. See 8 U.S.C. § 1252(a)(5); see also *Carlson v. Landon*, 342 U.S. 524, 537 (1952) (noting that the power to expel aliens lies with the political branches, but subject to "such opportunity for judicial review of their action as Congress may see fit to authorize or permit" as well as "judicial intervention under the paramount law of the Constitution.") (internal quotation marks omitted). Finally, the government also does not allege that Bayo has failed to exhaust other available remedies provided by the executive branch.

Bayo, however, still has one more hurdle to clear before he may prevail. To warrant a new immigration hearing on a due process claim, an alien "must establish that she was prejudiced, that is, that the error likely affected the result of the proceedings." *Alimi v. Gonzales*, 489 F.3d 829, 834 (7th Cir. 2007). Inability to

show prejudice is where Bayo's case founders. Had he known what the waiver said, Bayo would have had two options, either of which would have led to summary removal. If he had signed the waiver anyway, knowing full well what it said, he would be in the same situation as he is now. If he had refused to sign, he would have been removed summarily at the border because he did not have a proper visa. Perhaps there is a slight chance that after removal, Bayo could have obtained a visa to come to the United States, and then he might have settled in Indiana, met Tatiana Sia, and married her, allowing him to adjust his status based on marriage at that time. As Bayo admits in his brief though, "[i]t is difficult to compare what might have been with what is." This is true, and it is the reason why we find the explanation of how Bayo might have been harmed too speculative to support a showing of prejudice. This dooms Bayo's language proficiency argument as a basis for his petition.

## C

Finally, Bayo argues that even if his waiver is valid, he should be entitled to adjust his status based on his marriage to Sia under 8 U.S.C. § 1255(c)(4). That part of the adjustment-of-status statute prohibits VWP entrants from adjusting status unless adjustment is based on an immediate relative, defined by 8 U.S.C. § 1151(b) to include spouses. The government responds that Bayo has waived his right to contest his removal because he chose to enter under the VWP, and that process

included a waiver of the right to adjust status. See 8 U.S.C. § 1187(b)(2).

At first glance, it appears that there is a conflict between the adjustment-of-status statute, 8 U.S.C. § 1255(c)(4), and the VWP statute, 8 U.S.C. § 1187(b)(2). Upon closer examination, however, we believe that they can be reconciled. During the time when a nonimmigrant visitor is within the VWP's 90-day window, she may submit an adjustment-of-status application based on an immediate relative. An application submitted at that time would not represent a challenge to removal. After the visitor overstays her 90-day visit, however, the effect of the VWP waiver kicks in, preventing any objection to removal (except for asylum), including one based on adjustment of status. All of the circuits to have addressed this issue have held that the VWP waiver prevents an alien from applying for adjustment of status after 90 days have elapsed. See *McCarthy v. Mukasey*, 555 F.3d 459, 462 (5th Cir. 2009); *Momeni v. Chertoff*, 521 F.3d 1094, 1097 (9th Cir. 2008) (narrowing *Freeman v. Gonzales*, 444 F.3d 1031 (9th Cir. 2006), to its facts, as the court in *Freeman* allowed an adjustment-of-status application filed prior to the expiration of the 90 days under the VWP); *Zine*, 517 F.3d at 543; *Lacey v. Gonzales*, 499 F.3d 514, 519 (6th Cir. 2007); *Schmitt v. Maurer*, 451 F.3d 1092, 1097 (10th Cir. 2006). Bayo filed his application for adjustment of status long after his 90 days were up. As a result, his adjustment-of-status application is barred by his valid VWP waiver or by the fact that in the absence of a

waiver he never would have entered the United States in the first place.

* * *

We DENY the petition for review.