NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0603n.06

Nos. 08-4240 and 09-3663

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| VILME GJONAJ, | ) | |
| | ) | **FILED** |
| Petitioner, | ) | **Sep 13, 2010** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | ON APPEAL FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| ERIC H. HOLDER, JR., Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

Before: BOGGS and CLAY, Circuit Judges, and WISEMAN, District Judge.[*]

WISEMAN, District Judge. Petitioner Vilme Gjonaj is a thirty-five-year-old Albanian

citizen who was admitted to the United States on December 23 or 24, 2002 on a fraudulent Italian

passport. She filed a timely asylum application on December 15, 2003. Her asylum proceedings

commenced on January 22, 2004, when the Department of Homeland Security referred her original

application to the Immigration Court for asylum-only proceedings. The Immigration Court had

jurisdiction because Gjonaj had entered the United States with a passport from Italy, a country that

participates in the Visa Waiver Pilot Program ("VWP"). *See* 8 C.F.R. § 1208.2(b) ("Immigration

judges shall have exclusive jurisdiction over asylum applications filed by . . . aliens who have been

admitted to the United States under the Visa Waiver Pilot Program."); 8 C.F.R. § 217.2(a) (listing

countries participating in VWP).

---

[*]The Honorable Thomas A. Wiseman, Jr., Senior United States District Judge for the Middle
District of Tennessee, sitting by designation.

Gjonaj renewed her asylum application before the Immigration Court and also applied for withholding of removal under the Immigration and Naturalization Act ("INA") and the Convention Against Torture ("CAT"). Following several hearings, the Immigration Judge ("IJ") denied her application, and the Board of Immigration Appeals ("BIA") dismissed her appeal on September 4, 2008. Gjonaj now appeals the BIA's dismissal of her appeal of the IJ's decision.

In a second appeal, which has been consolidated with the first, Gjonaj seeks review of the BIA's May 14, 2009 order denying her motion to reopen the asylum proceedings to apply for an adjustment of status based on her marriage to a United States citizen on December 27, 2007 and the birth of a child to the couple on October 5, 2007. She indicated her new husband, George Thomas, had filed a Petition for Alien Relative (Form I-130) on her behalf on October 2, 2008, and that petition remained pending. The Department of Homeland Security did not file a response to the motion. In its written decision denying the motion to reopen, the BIA noted that the United States Citizenship and Immigration Services ("USCIS"), rather than the BIA, was the agency with jurisdiction to adjudicate the adjustment application. The BIA declined to reopen given that it had "no jurisdiction over the underlying application for relief." (Case. No. 09-3663 App. 3.) The BIA added, "To the extent that the applicant may seek to stay her removal while the USCIS adjudicates her adjustment application, she may file a request for such a stay with the DHS. 8 C.F.R. §§ 241.6(a) & 1241.6 . . . ." (Id.).

For the reasons set forth herein, we affirm both decisions of the BIA.

**I.     APPEAL OF THE DENIAL OF ASYLUM AND WITHHOLDING OF REMOVAL**

**A.     Factual and Procedural Background**

In her revised asylum application dated May 25, 2004, Gjonaj indicated she was seeking asylum based on religion and political opinion.[1]  (Case No. 08-4240 App. 130.[2])  She claimed she had been "mistreated on several occasions" and had received death threats from 1999 through 2002 as a result of her marriage to a Catholic and subsequent religious conversion from Islam to Catholicism, specifically by members of the "Islamic Albanian Group," an Islamic fundamentalist organization to which several members of her extended family belonged.  She alleged that her parents had also been threatened and mistreated as a result of her marriage and conversion.

Gjonaj supplemented her asylum application with a written personal statement in which she admitted entering the United States on December 24, 2002 with a picture-altered Italian passport.  She further elaborated on the statements made in her asylum application, asserting that she was seeking asylum based on the persecution she had suffered and was likely to suffer again if she returned to Albania because of her conversion to Catholicism[3] and her marriage to a Catholic.  She asserted that her entire extended family is made up of Islamic conservatives, with the exception of her father "who is slightly more moderate."  (App. 135.)

---

[1] In her original asylum application, dated December 10, 2003, Gjonaj checked only the box for "religion" under the question "Why are you applying for asylum or withholding of removal . . . ?"  (App. 144.)

[2] Unless otherwise indicated, all subsequent citations to the Appendix ("App.") refer to the Appendix filed in Case No. 08-4240.

[3] Gjonaj later testified at a preliminary hearing before the IJ on July 27, 2005 that the repeated averments that she had converted to Catholicism were technically incorrect; she had wanted to convert to Catholicism and be baptized, but this was "not possible."  (App. 203, 204.)

3

She stated that she married Robert Gjonaj, an American Catholic, on September 8, 1999, despite initial opposition from her immediate family, and that Robert left for the United States shortly after the marriage to make preparations for her to join him. Ten days after the marriage, her uncle and his nephews came to her house to talk to her father about the "scandal," and told her father on that occasion that if the marriage was not "broken" within twenty-four hours, they would kill Gjonaj. (App. 136.) When her father ordered the uncle and nephews out of the house, they began beating her father, and continued beating and kicking him even after he had fallen unconscious. Her mother was supposedly also beaten. The two nephews then found Gjonaj in her room where she was hiding and beat her as well. The following day, her parents reported the incident to the local authorities, who declined to take any action, purportedly in part due to the fact that her father was an "opposition activist." (*Id.*) Gjonaj, after talking with her parents, went to hide at a friend's house the next night.

Her parents later told her that the uncle and his nephews came back again that next evening. In her personal statement, Gjonaj asserted that on this occasion, they had firearms and were accompanied by four more men with long beards and scarves on their heads, also members of the Islamic Albanian organization. Gjonaj's parents told the men the marriage had been "broken" and that Gjonaj had left in the middle of the night without telling them. The men told her parents that they would find her and kill her. (App. 137.)

After that night, Gjonaj went to stay with her aunt in Pogradec, a town approximately two or three hundred kilometers from her family's home in Shkoder, where she believed she would be safe until Robert sent for her to join him in the United States. Apparently not trusting in Robert completely, Gjonaj's aunt and uncle also began to look for ways to get her into the United States.

4

To that end, Gjonaj went to Greece several times but, according to her personal statement, she was "caught by the Greek border patrols and deported back to Albania." (App. 137.) She claims that in March 2002 she was held in a Greek jail for two days and then, after being deported back to Albania, held in police detention in Albania for another two days where she was "severely beaten and interrogated for [her] father's political activity." (App. 137–38.)

Gjonaj stayed in Pogradec until June 2002, when her uncle and his nephews again showed up and asked for her, this time accompanied by two other men. They found her hiding, pulled her hair and kicked her and threatened to kill her. Her uncle stated "your end has come you evil whore," and instructed one of the nephews to kill her. At that point her aunt's husband came in with a gun and told the nephew to let her go. Some other neighbors came to help by this time, and the uncle, nephews, and two men left. After this incident, Gjonaj went to stay with another aunt in Durres. From there, she was able to arrange to get out of the country, traveling through Budapest to Paris using her own Albanian passport, and then from Paris to Los Angeles on an altered Italian passport, for which her father had paid $50,000. She arrived in Los Angeles on December 23 or 24, 2002, and went from there to Michigan. Soon after her arrival in the United States, she called her aunt in Durres and learned that her uncle and his nephews and five other men, all armed, had come to that aunt's house looking for Gjonaj three days after she had left.

Finally, in her written statement, Gjonaj proclaimed she was lucky to have gotten out of Albania alive, but was "heartbroken" because "the love of [her] life" was not with her. She claimed that Robert had gone through "all the procedures to have her join him in the US," but that she had not received any letters from the United States Embassy because she had been in hiding most of the time after Robert left. (App. 138.) She speculated that Robert or the Embassy might have sent other

5

letters that were intercepted by her uncle. (App. 139.) She also hypothesized that Robert probably thought she had betrayed him or was dead since she never responded to his purported attempts to contact her. (App. 139.)

Gjonaj's asylum application materials include a letter, in Albanian, written by her sister, Gentiana Shema,[4] and signed by her father and brother as well as her sister. (App. 119-21.) The letter is translated into English (which version is also signed by the same family members) and similarly recounts that the family is Muslim, and that Gjonaj's decision to marry a Catholic caused a conflict between Gjonaj's family and an uncle who is a fanatical Muslim. The letter corroborates Gjonaj's claim that the uncle and two nephews came to the house after learning about the marriage but differs from Gjonaj's account in a number of ways, including that the letter states the men "menaced" their parents but does not indicate that they actually harmed them physically, and adds that their father had a heart attack after the men left. (App. 122.) The letter also omits any mention of the visit on the second night, when Gjonaj was with her friend.

At the hearing conducted before Immigration Judge Robert Newberry on August 31, 2005, Gjonaj testified regarding the same events addressed in her written application, personal statement, and her sister's letter, but her live testimony differed in several significant aspects from her written statements. In her written materials, Gjonaj had indicated she came from a "traditionally Muslim family." (App. 135.) When asked at the hearing what religion her family practiced, Gjonaj stated "[f]rom my father's side, we were Muslim, and from my mother's side we were Catholic but the

---

[4] Gjonaj states in her asylum petition that her sister's name is Genjana Sumulia, her married name. (App. 129.) The signatures on the letter and the English translation of the letter supposedly written by her sister looks like "Gentiana," with the last name Shema instead of her married name. (App. 121, 122.)

6

Muslim side were more than the Catholic side." (App. 36.) Growing up, she had gone or was "pushed" to go to church with her mother, but she went to mosque primarily. (App. 38.) She acknowledged that her father's marriage to a Catholic girl had not caused problems for her parents, but she could not explain why not "because [she] didn't exist at that time." (App. 39.)

In addition, although she had indicated in her written statements that some of her persecution resulted from her father's political activities, she testified that her parents did not belong to any political groups while she was growing up in Albania; her father had merely participated in some demonstrations, along with a majority of the citizens of Shkoder. (App. 38, 71.)

In her original asylum application, Gjonaj had checked the box for "divorced" (App. 140); in her revised application, she had checked the box for "single." This entry was later corrected to "married" (App. 126) after she conceded at the hearing that she was still technically married. Asked about her husband, Robert Gjonaj, Gjonaj confirmed that she had had no contact with her husband since he left Albania in 1999 immediately after their marriage, and that she had heard a rumor that Robert had married again and moved to Canada. Gjonaj claimed at the hearing that she had lost touch with her husband because she had been in hiding with her various aunts. Letters from the United States Embassy were purportedly sent to her father's house; her father kept them but did not forward them to her or tell her about them until later.[5] Robert Gjonaj himself did not send any letters to Vilme Gjonaj, and the couple never spoke on the phone after he returned to the United States. (App. 56.)

_____

[5] The administrative record includes some letters from the American Embassy, which reflect that Robert was taking steps to procure a visa for Gjonaj, but that petition was eventually deemed abandoned based on Gjonaj's failure to respond to any of the letters.

7

In addition, although Gjonaj stated in the written materials that she had lost touch with her father, she testified that she had in fact stayed in touch with her father continuously since coming to the United States, and that he had never moved away from the house in which she had grown up. She testified at the hearing that she last spoke with him approximately two weeks before the hearing. (App. 56.) She alleged that, when she speaks to her father, they do not talk about the situation in Albania, except that her father tells her that she is safer in the United States than she would be in Albania.[6] (App. 57.)

Her testimony regarding her trips to Greece was also inconsistent with her written statements. At the hearing she testified that she went to Greece several times in hopes of making it from there to the United States. One such occasion occurred on March 9, 2002, when she went to Greece with some people she had never met before. She testified that she traveled to Greece on her own passport and stayed in a hotel for two days, returning on March 12, 2002, according to the Greek exit stamp on her passport. (App. 51.) The people who were trying to arrange for her to come to the United States told her it was "impossible," and she had to return to Albania. On direct examination, Gjonaj did not mention being detained in Greece or at the Albanian border, or being deported back to Albania.

---

[6] Gjonaj's mother, Bedrije Shema, came to the United States in 2001 and filed her own petition for asylum, which was denied. She was deported in 2006. Although her asylum application is not in the record, documents that are in the record (namely Gjonaj's motion to exclude her mother's asylum materials) indicate that the basis for Mrs. Shema's claim for asylum was completely unrelated to Gjonaj's. The IJ ultimately granted Gjonaj's motion to exclude Mrs. Shema's Form I-589 and the trial transcript from her removal proceedings. Mrs. Shema was supposed to testify at Gjonaj's hearing but refused to appear voluntarily, disregarded several subpoenas, and then was deported before giving testimony.

On cross-examination, Gjonaj stated affirmatively that she had never been arrested in Albania, or held in a jail, prison, police station, or immigration detention facility in Albania, and that she had never had any problems with the police or immigration officials in Albania. (App. 64-65.) The government's attorney then asked her to explain the statement in her asylum application in which she stated that when she went to Greece on March 9, 2002, she was "captured" while passing the border into Greece, held in jail in Greece for two days, then deported to Albania where she was held in police detention for another two days in the border city of Bilisht. (App. 65.) In response Gjonaj stated that, yes, she had been detained, "but they didn't tell me any good reason why they held me." (App. 65.) Asked whether she was held at a police station in Albania, she responded, "Yes, not that I ever committed any crime." (App. 65.)

Questioned about her statement about being deported from Greece, she stated: "I was taken by the Greek authorities or police and then they sent me to Albania, and the only reason that I think that they did is that because they thought I was sent there for prostitution. And that's the only reason I can think they did that." (App. 66-67.) She could not explain why she was held in Albania for two days either. She claimed the police "mentioned" their knowledge that her father had participated in political demonstrations. (App. 68.) They also asked her why she had gone to Greece, and then released her. They did not ask her about marrying a Catholic. When asked about being "beaten," she explained that by "beaten," she meant that the police pulled her hair and slapped her. (App.67.)

When asked to explain why her passport indicates she was admitted back into Albania on March 12, 2002, not that she was deported, she stated: "It's the seal actually, that they put in your, it's a stamp that they put in your passport and there is no other way that you can be admitted in Albania without having that stamp on it." (App. 69.)

9

Asked to explain other discrepancies between her written statement, her sister's letter, and her oral testimony, she stated she did not, at the time of the hearing, recall everything in detail anymore. (App. 78.)

Asked if "Genta Gjonaj" attended her wedding, Gjonaj was confused: "Genta. Genta is my sister . . . . But not Gjonaj. Gjonaj is the last name that I got after I married." (App. 81.) The judge pointed out that her passport included a notation that she had a daughter named Genta Gjonaj, born January 25, 2000. (See App. 82.) Gjonaj could not explain that entry. She speculated that the people who took her passport from her briefly when she was buying the Italian passport in Paris, and who then put her passport back in the lining of her suitcase, "probably they wrote that down, I have no idea. I don't have any children." (App. 82.)

She claimed her father picked up her Albanian passport from the police station in Shkoder on March 10, 1999. (App. 82.) She made no attempt to explain why her passport was issued in her married name six months before her marriage license was issued.

The IJ issued his opinion denying Gjonaj's petitions on November 21, 2006. The IJ found that Gjonaj did not testify credibly, and that, even if her testimony had been credible, she had not met her burden of proving that she was entitled to asylum. More specifically, the IJ found that Gjonaj's testimony contained "numerous inconsistencies and omissions when compared with her asylum application and the letter she claimed was sent from her sister in Albania." (App. 17.) The IJ referenced the following inconsistencies:

> (1) In her asylum application, Gjonaj stated her family was Muslim ("traditionally Muslim") but her testimony revealed that her father is Muslim while her mother is Catholic and even took her to church as a child.

10

(2)  Regarding the attack by her uncle on September 18, 1999, Gjonaj stated in her asylum application that she was knocked on the head with the handle of a knife.  In her testimony, she claimed she was only threatened with the knife.  The letter from her sister does not mention that either her father or mother was beaten, but claims that her father had a heart attack after the uncle and nephews left.  When asked about that detail during the hearing, Gjonaj testified that she did not refer to her father's heart attack in her papers because she did not actually witness it, which (a) made no sense in light of the sister's statement that the heart attack occurred after the relatives left and (b) did not prevent Gjonaj from testifying about other events she did not actually witness.

(3)  The sister's letter states Gjonaj went directly to her aunt's house after the incident and fails to mention the night spent at her friend's house or the return of the uncle the following night.

(4)  In describing the second visit from her uncle, Gjonaj testified that the uncle came back with the two nephews.  In her asylum application, Gjonaj stated the uncle and nephews were accompanied by four more men with long beards and scarves on their heads.

(5)  Gjonaj testified that after she left home, her father did not really have any more problems with the uncle, because she was the one the uncle was after, but Gjonaj's sister's letter states that her father continued to be harassed by the uncle, to the point that he suffered another heart attack in 2002.

(6)  Gjonaj testified at her hearing that she went to Greece and stayed in a hotel for two days before being told by the people through whom she was trying to make arrangement to go to the United States that she needed to go home.  In her asylum application, she claimed she spent two days in jail in Greece due to her illegal entry, and two more days in detention in Albania after being deported, where she was beaten and questioned about her father's political activities.  When questioned at the hearing about this discrepancy, she made no attempt to reconcile the two versions; she affirmed that she was deported and held in a police detention facility in Albania where she was slapped and had her hair pulled, but she was unable to say why she was detained and mistreated.  Gjonaj's testimony also appears to have been at odds with her passport, which contains multiple entry visas to Greece, valid for March 2002.

(7)  Gjonaj testified at the hearing that each time her uncle came after her, he was accompanied only by his two nephews.  In her asylum statement, she claimed the uncle and nephews were accompanied by four other men on the second visit to her parents' house, two other men when they came to her aunt's in Pogradec, and five other men when they came to her aunt's in Durres after she had left.  (App. 138.)

11

(8) In her asylum application, Gjonaj claimed she had lost contact with her father and did not know his whereabouts. At the hearing she testified that it was he who had sent her the documents she used to support her asylum application, that he had never left the family home, and that she had last spoken on the phone with him two weeks before the hearing.

(*See* App. 16-20.)

The IJ, besides noting the above-referenced inconsistencies, also found Gjonaj's testimony generally to be implausible for a number of reasons. For instance, she was unable to explain why her uncle was concerned about her marriage to a Catholic, but was unconcerned about her father's marriage to a Catholic. The IJ found this implausibility to be amplified in light of substantial evidence indicating that religious intermarriage is common and accepted in Albania and that relations among religious groups are amicable. (App. 20-21 (citing Ex. 4, Tab C, "Albania: Profile of Asylum Claims and Country Conditions, at 7; Ex. 5, Tab T, 2001 Country Report on Human Rights Practices, at 10; Ex. 5, Tab BB, 2000 Country Report on Human Rights Practices, at 9; Ex. 6, 2004 International Religious Freedom Report, at 6).)

As an another example of the implausibility of Gjonaj's testimony, the IJ pointed out that she claimed to have been beaten by police after being deported from Greece in relation to her father's political activities. When questioned further, however, she admitted that her father is not a member of any political party and that his political activities consisted solely of having attended two demonstrations in which the majority of the population of Shkoder participated. The IJ noted that there is some evidence that members of the Democratic Party suffered abuse by police while the Socialist Party was in power, but there were no reports of mistreatment of individuals deported to Albania after attempts to enter neighboring countries.

Finally, the IJ found that Gjonaj's testimony regarding her relationship with her husband was implausible. She could not say how long after the wedding her new husband stayed in Albania, only that he left sometime between the wedding on September 8, 1999 and the first visit from her uncle and nephews on September 18. She testified that her husband never sent her letters or called her after he returned to the United States, although he apparently filed a petition for an immigrant visa for her. She had no problem, however, maintaining contact with her family once she was in the United States. She was vague about her marital status in her asylum application, at one point referring to herself as divorced and another time as single, while admitting at the hearing that she was still technically married. She testified that she had no children, but her Albanian passport lists a daughter, Genta Gjonaj, born January 25, 2000. Gjonaj claimed her passport must have been altered by the individuals who made arrangements for her to enter the United States but offered no plausible explanation as to why they would do that.

Based on the inconsistencies, conflicting information, and implausible circumstances, the IJ found that Gjonaj was not credible and as such had failed to carry her burden of proof. He also held that even if Gjonaj had been credible, she had failed to establish past persecution or a well founded fear of future persecution. Because the IJ determined Gjonaj was unable to meet the standard of proof required to support her asylum claim, he likewise held that she was unable to meet the higher standard of proof required to support a claim for withholding of removal. Finally, he held that Gjonaj had not presented any proof that she was tortured in Albania or that it was more likely than not that she would be tortured if she returned to Albania, as required for CAT protection.

The BIA upheld the IJ's denial of Gjonaj's petitions for asylum, withholding of removal, and protection under the CAT in a one-paragraph opinion, stating in pertinent part:

13

[W]e are not persuaded that the Immigration Judge's adverse credibility finding in this case was "clearly erroneous," where he noted inconsistencies which are present in the record and were not adequately explained, including apparent embellishments of the applicant's story, as well as implausibilities. Contrary to the applicant's assertions on appeal, the inconsistencies noted by the Immigration Judge were not minor or immaterial; rather they are material inconsistencies which go to the heart of the applicant's claim, for example, whether the applicant was harmed by a knife or merely threatened with it, whether or not her parents were beaten, and how many men accompanied her uncle each time he came to attack the applicant. Furthermore, we disagree with the applicant's argument that the Immigration Judge mischaracterized and ignored evidence, and find instead that the Immigration Judge correctly portrayed the testimony and evidence presented by the applicant, and correctly pointed out inconsistencies contained therein.

(App. 1 (internal citations omitted).) On that basis, the BIA dismissed Gjonaj's appeal.

## B. Standard of Review

Under 8 U.S.C. § 1252 appellate courts have "jurisdiction to review the BIA's decision affirming the IJ's denial of asylum, withholding of removal, and relief under the Convention Against Torture." *Singh v. Ashcroft*, 398 F.3d 396, 400–01 (6th Cir. 2005). However, where, as here, the BIA opinion adopts the IJ's reasoning, this court also reviews the IJ's decision directly to determine whether the BIA's decision should be upheld. *Id.*; *Huang v. Mukasey*, 523 F.3d 640, 649 (6th Cir. 2008) (citations omitted).

In considering an appeal of the denial of a petition for asylum or withholding of removal, this court reviews administrative legal determinations *de novo*. *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). We review factual findings, including credibility determinations, under the substantial-evidence standard, keeping in mind that such findings are "'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). In other words, "the petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find

14

the requisite persecution or fear of persecution." *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003); *see also Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) ("To reverse the BIA's determination we must find that the evidence 'not only supports a contrary conclusion, but indeed *compels* it.'" (quoting *Yu*, 364 F.3d at 702–03) (emphasis in original)). This court may not reverse the agency's findings simply because it disagrees with its conclusions or evaluation of the evidence, or because it might have decided the case differently. *Singh*, 398 F.3d at 404; *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004).

## C.    Burden of Proof

### 1.    *Asylum*

Under the INA, "the Attorney General may grant asylum to an alien" if "the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(b)(1)(A). A refugee is defined by statute as any person outside of his or her country of nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101. "Persecution" is defined to include unjust harm or suffering inflicted upon an individual by the government or by persons the government is unable or unwilling to control in order to punish the individual for possessing the characteristic the persecutor finds offensive or seeks to overcome. *Matter of Acosta*, 19 I .& N. Dec. 211, 222 (BIA 1985).

The applicant bears the burden of establishing refugee status. 8 U.S.C. § 1158(b)(1)(B)(i). The applicant may be able to meet this burden through his or her own testimony, without corroboration, "but only if the applicant satisfies the trier of fact that the applicant's testimony is

15

credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii); *see also id.* § 1158(b)(1)(A) (providing that the Attorney General and Secretary of Homeland Security establish procedures and requirements for determining that an alien is a refugee as defined in 8 U.S.C. 1101(a)(42)).

To make the requisite showing, an applicant for asylum can establish that he or she suffered past persecution in the applicant's country of nationality on account of one of the aforementioned factors, creating a presumption that the applicant has "a well-founded fear of persecution on the basis of the original claim." 8 C.F.R. § 1208.13(b)(1); *see also Namo v. Gonzales*, 401 F.3d 453, 456 (6th Cir. 2005) ("The alien bears the burden of showing a 'clear probability' of such persecution."). An applicant can establish a well founded fear of persecution in the absence of past persecution if: (1) the applicant fears persecution in his or her country of nationality based on one of the aforementioned factors; (2) there is a reasonable possibility that the applicant would suffer such persecution if returned to that country; and (3) the applicant is "unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear." 8 C.F.R. § 1208.13(b)(2). That is, an applicant must "actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an 'objective situation' under which his fear can be deemed reasonable." *Perkovic v. INS*, 33 F.3d 615, 620–21 (6th Cir. 1994) (citation omitted).

### 2. *Withholding of Removal*

An alien can also request withholding of removal under 8 U.S.C. § 1231(b)(3). According to that subsection, the Attorney General may not remove an alien to a country if he finds that "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).

16

Thus, withholding of removal is mandatory if the alien demonstrates a "clear probability" of persecution upon return to his native country on account of race, religion, nationality, membership in a particular social group, or political opinion. *Mohammed v. Keisler*, 507 F.3d 369, 372 (6th Cir. 2007); 8 C.F.R. § 1208.16(b). In withholding-of-removal proceedings, an alien receives a presumption of future persecution if he or she establishes past persecution. 8 C.F.R. § 1208.16(b)(1)(i). If, however, the applicant does not establish past persecution, the Attorney General must withhold removal only if the applicant establishes "that it is more likely than not that he or she would suffer such harm." *Id.* at § 1208.16(b)(1)(iii); *see INS v. Stevic*, 467 U.S. 407, 424, 429–30 (1984) (noting that "clear probability" means it is more likely than not that the applicant's life or freedom would be threatened by persecution).

The standard of proof for establishing entitlement to withholding of removal is more stringent than the standard for proving a need for asylum. *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) (holding that the "clear probability" standard for withholding of removal does not converge with and may not be equated with the "well founded fear" standard that applies to applications for asylum). Consequently, an applicant's inability to establish a well founded fear of persecution for purposes of an asylum application will almost necessarily mean that the applicant cannot establish entitlement to withholding of removal.

### 3.    *CAT Protection*

Withholding of removal under the CAT is mandatory if the alien establishes that it is more likely than not that she will be tortured in her home country. 8 C.F.R. § 1208.16(c)(2); *Berri v. Gonzales*, 468 F.3d 390, 397 (6th Cir. 2006). "Torture" is defined by the regulations implementing the CAT as:

17

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). "Acquiescence" requires that the public official have prior awareness of the activity and "thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). The term includes a public official's "willful blindness" to the activity. *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006). In addition, in order to constitute "torture," the "act must be directed against a person in the offender's custody or physical control." 8 C.F.R. § 1208.18(a)(6). Thus, the applicant's burden of proof to establish eligibility for CAT protection is even more stringent than the burden of proving eligibility for withholding of removal. *Berri*, 468 F.3d at 397–98.

## D.      Analysis and Discussion

When an IJ decides that an applicant's testimony "lacks credibility, the IJ must include in his or her decision 'specific reasons' explaining why the IJ reached such a conclusion." *Singh v. Ashcroft*, 398 F.3d 396, 402 (6th Cir. 2005) (quoting *Sylla v. INS*, 388 F.3d 924, 926 (6th Cir. 2004)). Under the law in effect at the time Gjonaj filed her asylum petition, the IJ's reasons had to relate to "issues that go to the heart of the applicant's claim."[7] *Sylla*, 388 F.3d at 926. Moreover, "[i]f discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of

---

[7] The REAL ID Act of 2005 (Pub. L 109-13, 119 Stat. 231) amended 8 U.S.C. § 1158(b)(1) to allow the trier of fact to make a credibility determination "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii). This updated standard, however, "only applies to aliens who applied for asylum, withholding of removal, or other relief on or after May 11, 2005, the effective date of this division of the Act." *Amir v. Gonzales*, 467 F.3d 921, 925 n.4 (6th Cir. 2006). Gjonaj filed her first application for asylum and withholding of removal on December 15, 2003, so the REAL ID Act does not apply.

persecution, they have no bearing on credibility.'" *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004) (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).

In the present case, the petitioner argues that the IJ's adverse credibility finding was based upon inconsistencies and implausibilities that concern matters that are tangential to her asylum petition, or were the product of a faulty recollection of events that happened many years ago, some of which Gjonaj herself did not personally witness. While we agree that some of the issues relied upon by the IJ are relatively tangential,[8] most of the implausibilities and inconsistencies he referenced are related to issues "going to the heart" of Gjonaj's claim. *See Sylla*, 388 F.3d at 926. The most salient implausibilities and discrepancies concern her family's religion, her relationship with her husband, and the alleged events of persecution, all of which directly concern the reasons Gjonaj is seeking asylum.

Gjonaj also argues that she never intended for her asylum application to be a complete recitation of her claim, and intended all along to supplement it with her hearing testimony. She asserts that "[h]er failure to list in her written application facts that later emerge in testimony does not provide a sufficient basis for an adverse credibility finding because 'the circumstances surrounding the application process do not often lend themselves to a perfectly complete and comprehensive recitation of an applicant's claim to asylum.'" (Petitioner's Brief at 15 (quoting *Liti v. Gonzales*, 411 F.3d 631, 638 (6th Cir. 2005)).) The problem with this argument is that Gjonaj's

---

[8] The IJ arguably placed too much weight on discrepancies between Gjonaj's accounts and her sister's letter. It is undoubtedly true that different people see and remember events differently. In particular, the sister's failure to mention that Gjonaj spent a night at a friend's house before going to the aunt's in Pogradec is trivial, but it does seem strange that her sister failed to recall the second visit from the uncle and his nephews, especially when they were supposedly armed and accompanied by four men in long beards and head scarves on that visit.

19

written personal statement is rather *more* detailed in many respects than the testimony she gave at the hearing, and appears to include embellishments intended to enhance the merits of her asylum claim. For example, her written materials include the story of her supposedly being held in detention in Greece for two days before being deported, then held for another two days in police detention in Albania, where she was mistreated and questioned about her father's political activities. She omitted any reference to that event at the hearing until questioned about it on cross-examination, at which time she made no effort to reconcile the discrepancies between her oral and written statements. Other embellishments include the references to the additional two, four or five members of the Islamic Albanian Group who allegedly accompanied her uncle and cousins on three of the four instances when they purportedly came looking for her.

Finally, while a failure to fully recollect events that occurred up to six years previously could explain some of the discrepancies, Gjonaj did not seriously attempt to explain the discrepancies thus. In fact, her complete inability to provide adequate explanations for the discrepancies tends to support the IJ's finding that she lacked credibility.

Gjonaj also attempts to refute the country-condition evidence presented by the Government, which the IJ considered to support his finding that Gjonaj lacked credibility. Gjonaj points out that the State Department had the opportunity to, but did not, comment on the specifics of Gjonaj's case and that courts have continued to grant asylum to Albanian applicants. The cases she cites, however, relate to political persecution; none relates to persecution on the grounds of religious affiliation or religious intermarriage.

In sum, we conclude that the decision to deny asylum based upon Gjonaj's lack of credibility is based on substantial evidence. The adverse credibility finding is based primarily upon

20

discrepancies and implausibilities in the record that go to the heart of Gjonaj's claims. Because we will affirm on this basis, we do not reach the IJ's alternative finding that, even assuming Gjonaj to be credible, she did not carry her burden of proving past persecution or a well founded fear of persecution if she went back to Albania.[9]

Further, because Gjonaj has failed to establish her entitlement to asylum, she necessarily cannot establish that she is entitled to withholding of removal under the more stringent standard applied to such claims. *Cf. Ceraj v. Mukasey*, 511 F.3d 583, 594 (6th Cir. 2007) (holding that a petitioner who failed to meet the standards for asylum eligibility could not meet the higher standards for withholding of removal). With respect to the torture claim, the BIA did not expressly consider it, and the IJ noted that Gjonaj had presented absolutely no evidence that she had been subjected to torture in the past, as the term is defined by the CAT. That finding too is clearly supported by substantial evidence.

## III. APPEAL OF THE DISMISSAL OF GJONAJ'S PETITION FOR ADJUSTMENT OF STATUS

### A. Procedural Background

As indicated above, Gjonaj filed a motion to reopen before the BIA on December 2, 2008, in order to permit her to seek an adjustment of status based on her marriage to a United States citizen. The BIA denied the motion on the grounds that it lacked jurisdiction over the underlying petition for adjustment of status. Gjonaj filed a timely appeal of that order.

---

[9] Gjonaj also raises an argument addressed to the disparities between the rates of approval of Albanian asylum petitions by the Immigration Court in Detroit, Michigan as compared to those of seven other Immigration Courts with high volumes of Albanian asylum claims. This issue was not raised in the Immigration Court and relies upon documents that are not part of the administrative record. We decline to address this issue as it has not been exhausted and is not properly before us.

In this appeal, Gjonaj argues that the BIA erred in concluding that it lacked jurisdiction over her application for adjustment of status, because there is "no evidence that [she] knowingly and voluntarily waived her right to a hearing on her adjustment of status application" when she entered the country pursuant to the Visa Waiver Program ("VWP"). (Petitioner's Br. at 2.) Gjonaj specifically contends that "[t]here is no evidence" that she signed a waiver as part of her application for admission to the United States pursuant to the VWP, nor, if she did sign such a waiver, is there any evidence that she did so knowingly and voluntarily. (Id. at 6.) At oral argument, Gjonaj also argued that she would be prejudiced by the enforcement of the waiver. In its response to the present appeal, the Government argues that the BIA did not abuse its discretion in denying the motion to reopen.

## B.    Standard of Review

To be clear, Gjonaj does not seek review, in her present appeal, of the DHS's order for her removal, nor is this court called upon to review the merits of her petition for adjustment of status. Instead, we are called upon to review the BIA's denial of her motion to reopen based upon its determination that it had no jurisdiction to consider Gjonaj's underlying application for adjustment of status based on her marriage to a United States citizen.

The BIA has broad discretion to deny a motion to re-open, and its decision is reviewable for abuse of discretion. *INS v. Doherty*, 502 U.S. 314, 323 (1992) (holding that the abuse-of-discretion standard applies to motions to reopen regardless of the underlying basis of the alien's request); *Alizoti v. Gonzales*, 477 F.3d 448, 451 (6th Cir. 2007). The BIA abuses its discretion when it acts arbitrarily, irrationally, or contrary to law. *Alizoti*, 477 F.3d at 451 (citing *Babai v. INS*, 985 F.2d

252, 255 (6th Cir. 1993)). Because the BIA has such broad discretion, a party seeking reopening or reconsideration bears a "heavy burden." *Doherty*, 502 U.S. at 323.

### C.     Analysis and Discussion

Gjonaj sought to reopen in order to pursue an adjustment of status based on her marriage to a United States citizen. The BIA denied the motion to reopen based on its determination that Gjonaj was in "asylum-only proceedings," and therefore that the United States Citizen and Immigration Services (USCIS), rather than the BIA, had jurisdiction to adjudicate her adjustment application. (BIA Order dated May 14, 2009, Case No. 09-3663 App. 3 (citing 8 C.F.R. §§ 1208.2(c)(3)(i) and 1245(a)(1)).) The underlying basis for the BIA's conclusion that it lacked jurisdiction was that, as a factual matter, Gjonaj had entered the country with a passport from a country participating in the Visa Waiver Program. Gjonaj never disputed that fact during her asylum proceedings; rather, she expressly conceded that she had entered the country with a falsified Italian passport.

"The Visa Waiver Pilot Program was established by Congress to determine if a visa waiver provision could facilitate international travel and promote the more effective use of the resources of affected government agencies . . . ." Visa Waiver Pilot Program, 53 Fed. Reg. 24,898, 24,898 (June 30, 1988). Only citizens of VWP countries may participate in the Program, and only thirty-five countries currently qualify. 8 C.F.R. § 217.2(a). The VWP operates through a reciprocal waiver arrangement: The United States waives its visa requirement, and in exchange, the visitor waives her right to contest admissibility determinations or removal (except for asylum). In that regard, the authorizing statute provides:

> An alien may not be provided a waiver under the program unless the alien has waived any right–

23

(1) to review or appeal under this chapter of an immigration officer's determination as to the admissibility of the alien at the port of entry into the United States, or

(2) to contest, other than on the basis of an application for asylum, any action for removal of the alien.

8 U.S.C. § 1187(b).

At the time of Gjonaj's entry, the terms of the VWP were memorialized in Form I-94W, which had to be filled out and signed by all VWP entrants upon their arrival in the United States. Form I-94W described the visitor's waiver of rights as follows:

WAIVER OF RIGHTS:  I hereby waive any rights to review or appeal of an immigration officer's determination as to my admissibility, or to contest, other than on the basis of an application for asylum, any action in deportation.

Under the regulations, the Immigration Court has exclusive jurisdiction over asylum applications filed by aliens admitted to the United States pursuant to the VWP, 8 C.F.R. § 1208.2(c)(1)(iv), but the scope of review in asylum proceedings under that provision is expressly limited "to a determination of whether the alien is eligible for asylum or withholding or deferral of removal." *Id.* § 1208.2(c)(3)(i).  "During such proceedings, all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief." *Id.*  In sum, aliens who enter the country under the VWP must waive any right to contest deportation other than on the basis of asylum.  And while only Immigration Courts have jurisdiction over asylum applications filed by aliens permitted entry under the VWP, they do not have jurisdiction to consider applications for adjustment of status filed by aliens in that category.

24

In the present appeal, both parties argue the merits of the petition to adjust status and, in particular, the validity of Gjonaj's waiver of her right to petition to adjust her status. This court, however, has no need to consider the validity of Gjonaj's waiver.[10] In the first place, that issue was not presented to the BIA, and we generally do not have jurisdiction to consider issues not exhausted at the administrative level. *See Lin v. Holder*, 565 F.3d 971, 979 (6th Cir. 2009) (applying exhaustion requirement to a due process claim raised in the context of an asylum proceeding). More importantly, however, it is clear that the BIA did not act arbitrarily, irrationally, or contrary to law in concluding on the record before it that it did not have jurisdiction over the underlying application to adjust status. The BIA therefore did not abuse its discretion in denying the motion to reopen the asylum proceedings on that basis.

## IV.   CONCLUSION

For the reasons articulated herein, we **AFFIRM** the denial of Gjonaj's petitions for asylum and withholding of removal, and we **AFFIRM** the BIA's denial of Gjonaj's motion to reopen.

---

[10] The Seventh Circuit recently addressed the question of the validity of a waiver in *Bayo v. Napolitano*, 593 F.3d 495 (7th Cir. 2010) (en banc). That case is factually similar to the case at bar, insofar as the petitioner originated from a non-VWP country but had entered the country under a falsified passport from a country that was a VWP participant, and belatedly sought to adjust his status based on his marriage to a United States citizen. That case is procedurally at odds with this one because the petitioner in that case had not sought asylum, and he appealed an actual order of removal rather than an order denying a motion to reopen asylum proceedings.